

**C. Wanton BALIS, Jr., and Deborah Balis**

v.

**The UNITED STATES.**

**No. 50408.**

United States Court of Claims.

April 3, 1956.

J. Louis Monarch, Washington, D. C., for plaintiffs. Alfred J. McDowell, John Anthony Day, and Morgan, Lewis & Bockius, Philadelphia, Pa., were on the briefs.

James X. Kilbridge, Washington, D. C., with whom was Asst. Atty. Gen. H. Brian Holland, for defendant. Andrew D. Sharpe, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

Plaintiffs bring this action to recover an amount which they allege the Collector of Internal Revenue collected erroneously as taxes for the year 1948.

Plaintiff C. Wanton Balis, Jr. (hereinafter referred to as plaintiff), had been engaged in the reinsurance brokerage business for a long time. It is a specialized business, requiring intimate contacts between broker and client, connections with reinsurers, and the client's confidence in the broker's integrity and knowledge. Plaintiff, having the necessary qualifications, developed a prosperous business.

Since 1937 he had had a working arrangement with the insurance brokerage firm of Lukens, Savage, and Washburn, which had a large general insurance business. That firm, a partnership, had an informal partnership with plaintiff with respect to his reinsurance business. In the course of time, plaintiff's share in the profits of the joint undertaking increased. Finally it was decided to formalize the agreement. The arrangement was put on a new basis. Plaintiff was to share in the general insurance business of the partnership and

the partnership was to share in his reinsurance business. It was thought that both parties would profit thereby, the clients of each line of business helping the other to prosper.

To effectuate this arrangement two new partnerships were formed, in both of which plaintiff was a proprietary partner; Lukens, Savage, and Washburn were to carry on the business of insurance brokerage, and Lukens, Savage, Washburn, and Balis were to carry on the reinsurance business. The two partnership agreements, both of which were in writing, were substantially alike. Each provided, among other things, that the capital of the partnership was the excess of the partnership's assets over its liabilities. The amount of each proprietary partner's interest in capital was set forth in Schedule A attached to each partnership agreement. The amounts did not represent the actual monetary contributions made by the partners. It is not clear what they did represent. The amount listed opposite plaintiff's name was, as of January 1, 1947, the date of the partnership agreements, about 68 percent and, as of January 1, 1948, about 71 percent of the total capital listed in Schedule A of the reinsurance partnership; it was, as of January 1, 1948, about 2.7 percent of the total capital listed in Schedule A of the general insurance partnership. The capital account of the general insurance firm was much larger than that of the reinsurance firm. As a result, plaintiff's 2.7 percent of the total capital in the general insurance partnership amounted to $12,813.47, while his 71 percent of the total capital in the reinsurance partnership amounted to only $134,202.21.

For the purpose of determining capital, good will was to be computed as set forth in section 8 of each agreement. It was to be determined at the end of each calendar year or upon the death or retirement of a proprietary partner. Section 8 defined good will as 150 percent of the average annual gross income of the partnership for the preceding three years. It was provided that, if certain parts of the business did not continue in the same volume as in the past, an adjustment to reduce the good will computation would be made.

If the good will as determined at the end of each year exceeded or was less than the capital stated in Schedule A an adjustment was to be made to make the capital equal to the then value of good will. The individual proprietary partners' shares of the capital listed in Schedule A were then adjusted by distributing the change in capital in accordance with the partners' shares in net earnings.

Schedule C of each partnership agreement listed the partners' shares in net earnings. These percentages were subject to adjustment on or before January 31 of each year, by majority vote of the partners. As of January 1, 1948, plaintiff had a 71 percent share in the earnings of the reinsurance partnership and a 2 percent share in earnings of the general insurance partnership. His share in the earnings of the reinsurance partnership had been 70 percent at the time the agreements were entered into.

With some exceptions here unimportant, each agreement provided that each partner should devote his entire talents and energy to the business of the two partnerships. Furthermore, it was specifically provided that all reinsurance business of the general insurance firm should be handled by the reinsurance partnership.

The agreements also provided formulae for settling the accounts of partners in case of death or retirement of one of the partners. Two general situations were contemplated: one, if the partnership did not continue in business, in which event an accounting was to be made in the capital and net profits to each partner or his estate; the other, if the partnership did continue the business. In that event two further possibilities were provided for: one, if the partner leaving the partnership did not enter the same sort of business or if he died, he or his estate was to receive, in addition to his share of accumulated

profits, a payment equal to the amount listed opposite his name in Schedule A, currently adjusted for good will, as described above. In the alternative, if the retiring partner did set up in the same business as the partnership, an effort should be made to allocate the accounts that belonged with the continuing partnership and the accounts that belonged with the retiring partner. In cases of doubt the customer was to be approached directly to determine his preference. Each account should then be valued at 150 percent of the average annual commissions produced by such account over the three years prior to the partner's retirement. If the total amount of the retiring partner's accounts, as valued by this method, exceeded his share of the capital in Schedule A, he was to pay the difference to the remaining partners. If, on the other hand, the total amount for these accounts was less than his share of the capital, the remaining partners were obligated to pay him the difference.

The undertaking did not work out as had been expected. Virtually all the new reinsurance business was due to plaintiff's efforts and little if any new reinsurance business came directly from the general insurance firm's activities. Accounts which were ultimately assigned to plaintiff were producing more than 96 percent of the reinsurance partnership's income, yet his share in the earnings of the partnership and in the capital of Schedule A was only 71 percent.

After the formation of the new partnerships the reinsurance business grew in volume. The amount of plaintiff's capital on Schedule A increased from $90,885.53 on January 1, 1947, to $134,202.21 on January 1, 1948, while his share in the percentage of total capital increased only from 68 percent to 71 percent. Since he felt that he was receiving no sufficiently compensating benefit from his partnership in the general insurance business, which did not have a parallel increase in volume, plaintiff determined to leave both partnerships and set up his own reinsurance brokerage business.

Plaintiff retired from both partnerships on July 31, 1948, effective as of June 1, 1948. He took with him 87 out of the 91 reinsurance accounts in the reinsurance brokerage firm. None of the accounts of the insurance brokerage firm were assigned to him. As a result of the split, it was determined that the plaintiff should pay the reinsurance partnership, which continued in business, $61,353.95 (the excess of the value of plaintiff's accounts over his interest in capital) and that the insurance partnership should pay him $21,573.15 (the value of plaintiff's interest in the capital schedule of that partnership). Plaintiff's debt to the reinsurance partnership was reduced by $3,000, his share of the $4,000 paid-in-cash capital of that partnership. It was evidently assumed that he became entitled to this amount upon his retirement, though it does not appear what term of the partnership provided for this. The agreement provided that the payment the retiring partner should be called upon to make to the partnership, or vice versa, was to be a fixed obligation from the time of the partner's retirement, payable in not more than 12 equal installments at or before the end of each 6-month period after the partner's retirement, with interest at 5 percent per annum.

Incident to plaintiff's retirement plaintiff and his former partners entered into an agreement whereunder each party agreed not to solicit the accounts assigned to the other for a period of 4½ years. The facts indicate that the reinsurance brokerage business is a highly specialized field depending heavily upon the personal skill and character of the broker. For this reason it was improbable that any of plaintiff's clients would have switched from plaintiff to the general insurance partnership, particularly since it did not have any real experience in this line of work.

The parties handled the payments to each other separately. In 1948 plaintiff paid $18,715.70 (of which $1,215.70 represented interest) on his debt to his former partners. He paid the balance in

1949 and 1950. That same year plaintiff received $3,403.21 (plus $449.45 interest) on the general insurance firm's obligation to him.

Plaintiff deducted the amount paid as an expense in 1948, and counted the amount received as income in 1948. The reinsurance partnership treated the amount received as a long-term capital gain, whereas the general insurance partnership did not claim a deduction for what it paid plaintiff. The Commissioner of Internal Revenue allowed a deduction for the interest paid by plaintiff but disallowed a deduction for the remainder of what he paid the reinsurance partnership; he proposed to treat what plaintiff received as a long-term capital gain instead of as ordinary income. Plaintiff paid the additional amount assessed by the Commissioner and now sues for a refund.

Plaintiff claims that he is entitled to deduct the amounts he paid the reinsurance partnership under one of two theories: (1) he proposes to treat it as an ordinary and necessary expense under section 23(a) (1) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23 (a) (1) (A), or (2) as a loss sustained in his trade or business or on a transaction entered into for profit under sections 23 (e) (1) and (2) of the Internal Revenue Code of 1939. As an alternative, plaintiff proposes to exclude the amounts he paid to the reinsurance partnership from his income on the theory that they represent anticipated profits with the remaining partners in the event that the partnership had continued.

■ We do not think that plaintiff's payment was an ordinary expense of his business. He bought his partners' interest in the reinsurance firm so that he could again engage in the reinsurance business on his own account. This is not an ordinary expense of the business; see Philad Co. of Delaware v. Commissioner, 47 B.T.A. 565.

■ Nor do we think that the transaction can properly be treated as a loss under sections 23(e) (1) and (2). Plaintiff contends that he had made a bad bargain in his partnership agreements and that he made the payments to be free of it. He cites cases which have held such payments to be deductible as ordinary losses or as business expenses. But in those cases the loss stemmed from a contract which was made in the course of carrying on a business. The loss here, if that term is applicable at all, stems from the partnership agreement itself. The payment was made when plaintiff changed from one form of doing business to another, at which time he sold his interest in the general insurance firm and bought his partners' interest in the reinsurance accounts he was to take with him.

■ As a third alternative, plaintiff suggests that his payments to the reinsurance partnership should be excluded from his income on the theory that they represent the former partners' shares in the earnings of plaintiff's reinsurance business; similarly, that the amounts that plaintiff received from the general insurance firm should be included in his income on the theory that they represent plaintiff's share in the earnings of the insurance brokerage partnership.

Plaintiff relies on the case of Hess v. Commissioner, 12 T.C. 773, in support of this contention. In that case the surviving member of a partnership was allowed to exclude from his income payments out of the business made to the widow of his deceased partner. These payments were made under the partnership agreement which provided that the widow of the deceased partner would be entitled to certain stipulated monthly amounts out of the income of the business, so long as the widow lived or as the same type of business was continued. The court held these payments to be an obligation of the surviving partner under the partnership agreement, and treated them as exclusions from the surviving partner's income.

But the Hess case is distinguishable from the instant case. There the survivor was to make payments to the widow out of the income of the business; here the plaintiff became obligated to pay

a fixed amount upon his retirement, and the insurance partnership had a similar obligation. The plaintiff argues that the result of the arrangement here was in practical terms the same as in the Hess case, that the parties simply provided for payment of an amount "roughly equivalent to a sharing of profits for a limited time following the retirement of a partner."

It is this very difference which brings about a different result. In the instant case the terms of the contracts and the circumstances under which the agreements were made show clearly that the interests of the various parties constituted their capital. Upon entry into the partnership plaintiff was obligated to devote his skills and efforts completely to the partnership business; he could not enter the reinsurance business (or the insurance business) except by settling with his partners. The fact that plaintiff's clients would deal only with him does not alter the undoubted right of plaintiff's partners to prevent plaintiff from dealing with his clients except in strict accord with the partnership agreements.

The bargain was not one-sided. If plaintiff wished to retire for other purposes than going into the same business, or if he died, his partners were obligated to pay the capital credited to his name in Schedule A. If he took with him less in accounts than the amount set opposite his name, his partners had to pay him the difference. From the beginning, plaintiff's share in the capital of Schedule A of the reinsurance partnership was evidently less than his contribution to the reinsurance business warranted. He nevertheless undertook this obligation in order to receive the benefits of the partnership. When the plaintiff did not realize the success he anticipated from the partnership, he still was saddled with the obligation he had incurred to enter it. He could not reenter the reinsurance business on his own except by satisfying this obligation. Under the circumstances, it was the condition plaintiff had to fulfill in order to receive his partners' interest in the partnership and engage in business for himself. Such payment is most nearly described as a capital expenditure.

Plaintiff objects that the expenditure here was for the "good will" of a personal service business and cites authority to the effect that professional reputation is not a vendible asset. Plaintiff concludes that he could not have made a capital expenditure when he acquired no identifiable asset. It is quite clear that good will, as defined in section 8 of the partnership agreements, was something more than what is understood by that term as it is customarily used. Here the term was used in large part as a convenient yardstick for measuring the value of the interest which each partner had in the assets of the respective businesses.

We may assume, however, for the purposes of discussion, that the transaction did involve an element of good will as that term is commonly understood. Generally it is true that, per se, professional reputation is not an asset that can be bought and sold. But this is not so invariably, and the good will of a professional business may be the subject of sale. MacFadden v. Jenkins, 40 N.D. 422, 169 N.W. 151. It cannot be doubted that plaintiff's right to exercise his professional skills had been circumscribed by the partnership agreements and that he had thus given his partners a share in accounts which would otherwise have been solely his own. He bought their share of the business in order to set up his own. He thereby made a capital expenditure. Newburger v. Commissioner, 13 T.C. 232.

Plaintiff's petition will be dismissed. It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.